WOOD v. TODD et al.

(Circuit Court of Appeals, Third Circuit. June 14, 1918.)

No. 2342.

1. RECEIVERS ☞69—INSISTENCE ON RIGHTS.

If the receiver of a corporation, substantially benefited by the unauthorized acts of its chief owner and manager in operating the business, prefers still to insist on the enforcement of the legal consequences of such acts, the court can merely administer the law as it is, without regard to considerations beyond its sphere.

2. PARTNERSHIP ☞258(8½)—CONTINUANCE AFTER DEATH—QUESTION OF FACT.

Whether a partnership was dissolved by the death of one member, or continued for a time in accordance with certain written articles of copartnership, is purely a question of fact.

3. PARTNERSHIP ☞258(8)—CONTINUANCE ON DEATH—SUFFICIENCY OF EVIDENCE.

In suit by receiver of a partnership against the receivers of subsidiary companies and a surviving partner, evidence *held* insufficient to show that the partnership was not dissolved by the death of the other member of the firm, on account of the existence of an agreement that it should continue for liquidation.

4. PARTNERSHIP ☞248—LIQUIDATING PARTNER—POWER TO MAKE NOTE.

A liquidating partner of a firm dissolved by the death of a partner cannot make a firm note, whether it be a new contract or a renewal of a pre-existing firm indebtedness; a rule applicable only when not differing from the law of the place where the partnership business is done and note given.

5. PARTNERSHIP ☞255(1)—LIQUIDATING PARTNER—AUTHORITY TO ISSUE NOTES.

By the law of Pennsylvania, a liquidating partner, acting in good faith and for liquidation, has authority to execute notes in renewal of obligations made before dissolution, and to borrow money on new notes to pay firm debts incurred before dissolution, but no authority to issue notes and contract in continuation of the business.

6. PARTNERSHIP ☞255(1)—LIQUIDATING PARTNER—AUTHORITY TO CONTINUE BUSINESS.

A surviving partner of a corporation dissolved by death, in liquidating partnership assets, has authority in some cases to continue the business to complete existing contracts and work up unused materials.

7. PARTNERSHIP ☞255(1)—LIQUIDATING PARTNER—LIABILITY ON NOTES.

Where a liquidating partner makes notes without authority in the course of continuing the business, not to liquidate it, he, and not the firm, is liable for their payment.

8. PARTNERSHIP ☞258(8)—DISSOLUTION—TERMINATION OF CONTRACT—SUFFICIENCY OF EVIDENCE.

In suit by receiver of a partnership against the receivers of subsidiary companies and a surviving partner, evidence *held* insufficient to show agreement between partnership and one of subsidiary companies, whereby the firm shared in its profits and losses, did not terminate by death of partner.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. PARTNERSHIP ☞255(1)—DISSOLUTION BY DEATH—LIABILITY FOR LOAN.**

Money loaned partnership by subsidiary corporation after partner's death, used in paying obligations of firm incurred prior to dissolution by death, constitutes valid obligation of firm, and its receiver must repay amount; but money so loaned and used by surviving partner in improperly conducting business of firm after dissolution is only an obligation of the surviving partner.

**10. PARTNERSHIP ☞255(1)—DISSOLUTION BY DEATH—CONDUCT OF LIQUIDATING PARTNER—LIABILITY OF FIRM UNDER CONTRACT.**

No conduct of surviving partner as liquidating or continuing partner could make firm dissolved by death of other partner liable for losses of subsidiary company incurred after latter's contract with firm had become extinct by firm's dissolution, just as no conduct of his would entitle firm to half profits company might have made after contract had ended, nor is surviving partner himself liable.

**11. PARTNERSHIP ☞255(1)—DISSOLUTION—ASSUMPTION OF CONTRACT WITH SUBSIDIARY.**

If a surviving partner assumed his firm's contract with a subsidiary company after dissolution of the firm by death of the other partner, he assumed the whole of it, entitling him to reimbursement for expenses, as well as rendering him liable for half losses.

Appeal from the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Suit in equity by M. H. Todd, receiver of the liquidating partnership of Walter Wood and Stuart Wood, deceased, late trading in the name, style, and firm of R. D. Wood & Co., and the Provident Life & Trust Company and Edward R. Wood, Jr., executors under the last will and testament of Stuart Wood, deceased, against the Florence Iron Works, Harold B. Wells, its receiver, the Camden Iron Works, Heulings Lippincott, its receiver, and Walter Wood. From the decree, Walter Wood appeals. Affirmed in part, and case remanded, with instructions to modify the decree in accordance with the opinion.

J. H. Brinton and W. A. Glasgow, Jr., both of Philadelphia, Pa., for appellant.

Norman Grey, of Camden, N. J., and J. Henry Radney Acker and William F. Norris, both of Philadelphia, Pa., for appellees.

Joseph H. Gaskill, of Camden, N. J., for Florence Iron Works and Harold B. Wells.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. The difficulties in this case arose out of the business relations of the three concerns here present by their receivers, which were complicated by cross property interests and liabilities and by the informality with which each did business with the others. A statement of these relations and of the conduct of the parties, somewhat in detail (but without regard so far as possible to matters settled by the decree and not raised on appeal), is necessary before the questions involved can be presented and understood.

For two generations or more there have been many partnerships bearing the firm name of R. D. Wood & Co. They comprised in each

instance members of the Wood family and changed in their personnel only as partners died or withdrew and others were admitted. In the succession of one firm by another, it frequently happened that one firm of R. D. Wood & Co. would be actively doing business when at the same time other firms of R. D. Wood & Co., differently composed, were in process of liquidation. All the firms were engaged in substantially the same business, which, while embracing varied enterprises, had to do mainly with the purchase and sale of iron and steel products, more particularly iron pipes, lamp posts, hydrants, and related foundry castings. Of the different partnerships we are concerned perhaps with only three. The first is that of December 31, 1887, composed of Richard Wood, George Wood, Walter Wood, and Stuart Wood, under an agreement, which, as the evidence shows, was the last articles of co-partnership formally entered into by writing. Richard withdrew from the firm in 1894, whereupon another partnership followed composed of George, Walter and Stuart. This partnership was dissolved in 1911 by the withdrawal of George, leaving Walter and Stuart to compose the firm of R. D. Wood & Co., whose receiver is the complainant in this action.

The members of the Wood family, comprising at different times the different firms of R. D. Wood & Co., controlled by stock ownership, either individually or as partners, Florence Iron Works and Camden Iron Works, corporations engaged in the manufacture of iron and steel products of the kind in which the firms dealt. The principal business of all firms of R. D. Wood & Co. in recent years was that of acting as financial, purchasing and selling agents for these two manufacturing corporations under an arrangement contractual in character but not reduced to writing, which, with respect to Florence had existed for thirty years. The firms, howsoever composed, bought the raw material and sold the finished product for Florence—in fact, transacted all its business save that of manufacturing—and received in return a sum equal to the firm's expenses incurred in conducting the business of Florence and one-half of its profits, being liable for one-half of its losses. The same arrangement maintained with respect to Camden, with the exception that there was no division of profits and losses.

This relation of agency between the firm composed of Walter and Stuart Wood and the two corporations, existed on March 2, 1914, when Stuart died. The cross property interests and liabilities of the firm, of the partners, and of the two corporations at that time, appear as follows:

Of the 1,250 shares of the capital stock of Florence, Walter owned 785, Stuart 314 and the firm 151. Of the 8,000 shares of the preferred stock of Camden, Walter owned 3,180, Stuart 1,848 and the firm 2,531; and of the 7,000 shares of its common stock, Walter owned 1,915, Stuart 1,256 and the firm 2,346, besides certain rights evidenced by scrip certificates. Of the issue of $750,000 bonds of Camden, the firm owned $660,000, besides its serial notes to an amount of $96,-000. Camden was also indebted to the firm in the sum of about $170,-000. Florence owed the firm about $21,000, and Camden owed Flor-

ence about $200,000. Florence owed Walter about $500,000, and Stuart about $100,000. Camden owed Stuart about $70,000, and Walter about $3,000. The firm owed Walter about $409,000, and Stuart about $750,000. Walter's interest in the partnership was $42/_{65}$ and Stuart's interest $23/_{65}$.

It thus appears that the two corporations and the firm were not only closely related by property interests, but they were almost inextricably tied together by liabilities. It had long been the custom for one to loan money to the others as necessity required and as the ability of any one permitted, always at the will and direction of members of the firm, who were also officers, directors and the principal stockholders of the two corporations. There was a constant flow of cash between the three and a running debit and credit cash account with almost daily entries was maintained. Both corporations of late years had been losing money, thereby involving not themselves alone but also the firm of R. D. Wood & Co., their financial agent.

In carrying out the business of financing and managing the two corporations, the firm had largely extended its credit. Its obligations, aggregating a very large sum, had been sold through note brokers and were in the hands of many banks.

At the time of the death of Stuart, Walter was in Europe seeking business with which to span the period of depression in the steel industry at home. He hastily returned and found the affairs of the firm and of the two companies in a critical condition. The most pressing need was money with which to meet the firm's maturing obligations. The finances of each concern were quite insufficient to meet its own obligations, and the assets of each, being in the main illiquid, could not readily be used to help the others. But Florence, owing to its practice of manufacturing in one season for sale in another, had accumulated about one-half million dollars worth of finished products, which Walter promptly set about to sell at a sacrifice and convert into cash. Being the managing head of Florence as well as the surviving partner of the firm, he directed Florence to purchase with the moneys thus coming in the outstanding notes of the firm as they matured, thereby easing the firm but causing Florence to become the holder of the firm's notes in a considerable sum. He adjusted the balance between Camden and Florence and proceeded with the business of the firm with the object, as he maintains, of liquidating it, but with the effect of prosecuting the business as before the death of Stuart by making new contracts for the purchase and sale of materials for Camden and Florence and by creating firm obligations other than renewals of obligations which existed before Stuart's death.

Walter's efforts to meet the financial difficulties of the firm and to keep Camden and Florence going did not meet the approval or enlist concurrence of the executors of Stuart. Indeed, his efforts met their positive opposition, resulting in a controversy, both official and personal, of which much was made at the hearing, but which, we think, has little to do with the decision of the case. The result of it all was that the firm and the two corporations were thrown into receiverships and the controversy between Walter and the executors of Stuart sur-

vived to the receivers of the three concerns, who in this action ask a determination of their rights and liabilities growing out of Walter's conduct of the business after Stuart's death.

On the appointment of the receiver for Florence there came into his possession notes of R. D. Wood & Co. amounting to the sum of $202,-991.66, together with collateral consisting of $452,000 first mortgage bonds of Camden with the coupons attached and $48,375 of overdue coupons which had been severed. The receiver of R. D. Wood & Co. and the executors of Stuart Wood filed the bill in this case against the receiver of Florence (joining the receiver of Camden, and Walter Wood), praying that the notes of R. D. Wood & Co. which were held by the receiver of Florence be cancelled and their accompanying collateral be surrendered on the ground that they were invalid as against the firm because issued by Walter, surviving partner, not in liquidation but in continuation of the firm's business, and praying in the alternative, that Walter be decreed to pay the same, alleging misconduct on his part in manipulating the affairs of the three companies to his own advantage in view of his larger interest in one than in another.

For defense, Walter denied the bad faith charged to him and justified his irregularities in shifting moneys and collateral from one concern to another by the exigencies of the situation and upon the legal contention that by the terms of the co-partnership entered into by Stuart and himself, the partnership continued for one year after the first of January following the date of the death of a partner, and, that, in consequence, the partnership had not been dissolved by the death of Stuart but its dissolution was deferred to the end of the period prescribed by its terms, which had not expired. In a word, Walter contended, and still maintains, that he was authorized by the terms of the contract of partnership to conduct the business of the firm in the same manner after Stuart's death as it had been conducted before his death, for a prescribed period of liquidation.

The decree entered by the trial court decided many matters not here on appeal. It disposed of the question of the alleged bad faith of Walter Wood by deciding, that in his conduct of the business of the several companies, irregular and involved though it was, there was nothing morally reprehensible, but, on the contrary, he was actuated by no motive other than to do the best he could for all concerned. The court recognized that the burden he assumed was not a light one, and that it was not made easier by the executors of his brother's estate standing unyieldingly on their legal rights in refusing aid when the giving of aid was within their power and demanding payment of the firm's debt to the estate at a time that made inevitable the collapse of the three concerns.

The court found no evidence of terms of partnership between Walter and Stuart whereby the partnership continued for a year after the first of January following the date of the death of a partner, and held, in the absence of testimony, that the partnership was terminable at will and was therefore dissolved upon the death of Stuart. The court further found, upon a like want of evidence, that the contract between the firm and Florence, whereby the firm became the purchasing, sell-

ing and financial agent of Florence, was not a contract extending from year to year but similarly was a contract terminable at will and ended with the dissolution of the partnership. These two findings opened the question as to who is liable for the payment of the many notes bearing the firm name of R. D. Wood & Co (in the hands of the receiver of Florence) according as they were validly made in renewal of the debts of the partnership incurred before dissolution, or invalidly made by Walter in conducting business thereafter as though the partnership had not been dissolved.

For convenience, the notes in dispute, aggregating $202,991.66, were divided into five groups. The first consisted of 14 notes made by R. D. Wood & Co (the court found) during the lifetime of Stuart; the second, 6 notes in renewal of notes made during the lifetime of Stuart; the third, 2 notes in renewal of notes made during the lifetime of Stuart; the fourth, 5 notes made after the death of Stuart; the fifth, 2 notes, one for $24,377.99 and the other for $48,375 made by Walter Wood acting for the firm as liquidating partner in settlement of an open account of Florence against the firm. With all notes, collateral was originally pledged or subsequently given.

The court divided the notes and charged liability for their payment according to the purpose for which they had been given, namely, in payment of debts incurred by the firm before dissolution on Stuart's death, or, for debts incurred afterward, and accordingly held the receiver of the firm liable for the notes of the first three groups, for one of the four notes of the fourth group, and for a part of the open account closed by the two notes of the fifth group, and held Walter Wood liable for the remaining four notes of the fourth group ($20,-000) and for the balance due on the open account closed by the two notes in the fifth group ($38,132.07), amounting with interest to $68,373.53.

The basis of the court's decision was that Walter Wood had no authority as liquidating partner to continue the business of the firm as distinguished from winding it up, and that he was therefore personally liable for notes representing debts incurred in prosecuting the business as a continuing partnership. Four notes of the fourth group are within this class.

The two notes of the fifth group embrace moneys loaned from time to time by Florence to the firm, and one-half of the losses of Florence charged to the firm under the purchasing and selling agency contract. The court held that as Walter Wood had assumed to continue the business of the firm in financing Florence under the financing contract, he must be charged individually precisely as the firm would have been charged had the partnership continued after the death of Stuart.

The part of the decree entered adversely to the receiver of the firm has been accepted by the receiver, the notes have been paid and the collateral returned. From the part of the decree charging Walter Wood individually with liability on four of the notes of group 4 and a portion of the notes of group 5, amounting in all to $68,373.53, Walter Wood has taken this appeal.

Without discussing for the moment Walter's method of conducting the business of the partnership and of the two manufacturing corporations after Stuart's death, his method very certainly achieved two things: it prevented the failure of all three companies in the spring of 1914, when the depression in the steel industry preceding the outbreak of war was at its lowest, and it kept them alive and going until. the end of that period. The collapse came just before the turn, with the result, that the newly appointed receivers of Camden, availing themselves of the tremendous stimulus which later the war gave the iron and steel industry, were enabled to operate its ·works so profitably that the large amount ·of money they made (much of which will pass to the receivers of R. .D. Wood & Co and Florence) has transformed the clear insolvency of the three concerns into substantially more than solvency of two and perhaps of all of them. This controversy having at· the beginning been a contest as to who should be liable for debts incurred by the irregular business management of ·Walter Wood, is now changed to a contest more directly for a division · of large profits which would not have been made but for that very irregular business management, so vigorously attacked at the beginning of the litigation.

[1] The fortunate outcome of Walter's method of doing business is urged by him in justification of its irregularity and in defense to the claim of Stuart's executors, who, in this litigation, are insisting, none the less, on the full enforcement of their legal rights. Legality of conduct cannot be determined by its consequences. If a person who has been substantially benefited by the unauthorized acts of another prefers still to insist on the enforcement of their legal consequences rather than to accept gratefully the benefits arising from. them, the court can do no more than administer the law as it is, without regard to considerations beyond its sphere. As the case is controlled by well established legal principles, our sole task is the application of those principles to facts, which in the main are not disputed.

[2, 3] As the case appears here on appeal, four questions are presented for review. The first is: Was the firm of R. D. Wood & Co. dissolved by the death of Stuart Wood on March 2, 1914, or did. it continue for one year from the first of January after his death in accordance with certain written articles of copartnership?

This is purely a question of fact. There was a firm of R. D. Wood & Co. In that firm, Walter and Stuart Wood were partners. Manifestly, there was between them a contract of partnership. Its terms were not reduced to writing. The simple question is: What were its terms?

This question is made doubly difficult of solution because the contract of partnership was not only not reduced to writing but there is in the case no direct evidence of its terms affecting dissolution,—the only terms with which we are now concerned. If its terms in this regard are to be found, they are only to be bound by inference, and then not from facts, but from statements made by the partners when dealing with matters not affecting the terms of the partnership contract. Nor are they to be found from the conduct of the partners,.

because with respect to the critical terms of the contract having to do with the dissolution of the partnership on the death of a partner, the partners, of course, prior to the death of Stuart, never had occasion to act.

Walter Wood maintains that the partnership contract between himself and Stuart was the same partnership contract of another firm of R. D. Wood & Co. formally entered into in writing between Richard, George, Walter and Stuart on December 31, 1887. That contract expressly provided for dissolution of the partnership, (1) by agreement of the partners, (2) by the expiration of a three year term, and (3) by the death of a partner. In the last event, the contract deferred dissolution by the provision, that:

"The death of any partner during the partnership shall not work a dissolution of the firm until one year from the first of January next following his decease, or the termination of this agreement, either by notice as above provided or by the efflux of time, whichever first shall happen."

This was the last written contract of partnership of any firm bearing the name R. D. Wood & Co. Its importance to the case lies in the fact that it contains the only provision anywhere found by which a dissolution of partnership on death of a partner is postponed. In order to justify his continuing the business of the partnership after Stuart's death, Walter undertook to prove that this provision of the partnership contract of 1887 was in his partnership contract with Stuart in 1914. This he endeavored to prove from certain admissions made by Stuart in writings to which we shall refer.

In certain litigation in a Court of Common Pleas for the County of Philadelphia—which has nothing to do with this case—in which George, Walter and Stuart were parties, the cross-bill charged:

"That for many years prior to March 26, 1894, the said Richard Wood in association with his brothers, Walter, George, and Stuart Wood, defendants herein, carried on business as co-partners *under articles of agreement renewed from time to time* in which the business was described as [the manufacture, erection and sale of cast iron pipes, etc.].

"*The last articles entered into* by the partners were dated December 31, 1887 and provided for the carrying on of the business for the further term of three years. *They, however, continued the business without interruption after the expiration of this period until March 26, 1894* when Richard Wood as herein before stated made an assignment for the benefit of his creditors which transferred to his assignee his entire interest in the assets of the said co-partnership."

To the averments of this paragraph of the cross-bill, Walter and Stuart Wood stated, by their answer, that:

"*We admit the averments of the second paragraph of said cross-bill.* * * * *We aver also that said business* with the knowledge and consent of said Richard Wood and his then assignee *was continued after said assignment just as it had been before.*"

Walter Wood relies on Stuart's admission in these pleadings as proof that the partnership of 1894 between George, Walter and Stuart was the same as that of 1887 between Richard, George, Walter, and Stuart, and remained the same after 1894.

To carry the terms of the contract of 1887 past the partnership of

1894 and into the contract of partnership of 1914, Walter offered an agreement (July, 1911) between George, Stuart and himself, partners of the firm of 1894, in which it appears that the firm of the last date had been dissolved and the firm of 1911–14 had been formed. It was provided that:

"Notice of dissolution of the firm of R. D. Wood & Co. shall be forthwith published in the following form:

"Owing to the death of Richard Wood and the prior withdrawal of George Wood the present firm of R. D. Wood & Co. is composed of

"Walter Wood
"Stuart Wood."

This is all the evidence there is upon the subject, excepting the testimony of Walter Wood in reply to the following question:

(Q.) Was there any other partnership agreement under which you were operating other than that of 1888 (87)? (A.) None.

We do not regard the provision in the will of Stuart Wood, conferring upon his executors uncontrolled discretion to aid in the liquidation of the firm for a period of two years, as evidence of a continuing partnership. That provision indicates rather that Stuart did not consider that the firm would continue after his death but that it would be dissolved by his death. The provision was made evidently in contemplation of the needs of the firm in liquidation, which Stuart doubtless knew would be frequent and perhaps immediate, not in contemplation of the needs of the firm in continuing its business.

The admissions of Stuart in the pleadings of the case in the Pennsylvania court do not appeal to us as showing in any way that the contract of 1887 between four partners was the same as that of 1894 between three partners. The averment simply was that articles of copartnership had been entered into in 1887, and that the *partners had continued in business* without interruption until 1894, when Richard Wood withdrew. This doubtless was true, but when Richard withdrew there was a new partnership formed between the three survivors. As to this, Walter and Stuart averred "that the said *business*  *.  *  * was continued after the said assignment just as it had been before." This also was true, because the business of each firm of R. D. Wood & Co. was substantially the same as that of every other firm bearing the same name but differently composed. This averment does not prove that the terms of the new partnership after 1894 were the same as those in the written articles of 1887. In some respects they were not and could not be the same, because the partners were different in number and in persons and correspondingly the interests of the new partners were different. Later, when George dropped out, there was still another partnership formed with another change of partners and of partnership interests without anything to indicate whether terms as to dissolution were brought into it from the preceding partnership or from the partnership preceding that one.

Walter's answer in the negative to the question: Was there any other partnership agreement under which you were operating other than that of 1888 (7)?—if taken literally, is untrue, for he was a member of two firms after that of 1887, each having its own partnership

agreement (though not in writing) under which he operated; if taken as doubtless he intended, namely, that he operated under no written partnership agreement, other than that of 1888 (7), then his statement sheds no light on the unwritten contract of partnership of 1914 between him and Stuart.

A very careful study of this record causes us to observe again that the trouble in this case arose out of the informality with which different partners formed and dissolved different partnerships, and carried on one while winding up another, without an attempt to state with an approach to legal formality the terms of a partnership and without very much regard as to what the terms really were. The partners just went on and did business in a way satisfactory to themselves but in a way that would very certainly produce trouble of this kind. In it all, we cannot find out what Walter and Stuart Wood agreed upon—if they agreed upon anything—with respect to the dissolution of their firm. The record simply does not tell us. Nor does it give us anything substantial from which we might infer the terms, were we disposed to find a contract by inference. In what we regard as a record silent upon the subject, we cannot make a contract for Walter and Stuart. We cannot hold, therefore, that the deferred dissolution provision of the contract of 1887 is a part of the contract existing in 1914. Such being the case, we are of opinion that the learned trial judge was clearly right in holding that the contract of partnership between Walter and Stuart was one terminable at will, and that, in legal consequence, the partnership was dissolved by the death of Stuart.

[4, 5] The second question is: Is Walter Wood liable to the receiver of Florence Iron Works to the amount of $20,000 with interest upon four certain promissory notes of what is known in the case as group 4?

This question turns on well established principles of law as applied to the circumstances under which the notes were given. The general rule is, that a liquidating partner of a firm dissolved by the death of a partner, cannot make a firm note, whether it be a new contract or in renewal of a pre-existing firm indebtedness. Cases quoted in 32 L. R. A. (N. S.) 255; 30 Cyc. 668. But this general rule is applicable only when not differing from the law of the place where the partnership business is done and the partnership note is given. The law of the place which controls this case is the law of Pennsylvania. By that law, the general rule is modified, and a liquidating partner, acting in good faith and for the purpose of liquidation, has authority not only to execute notes in renewal of obligations made before dissolution but to borrow money upon new notes to pay firm debts incurred before dissolution; but under the Pennsylvania law as under the general rule, the liquidating partner is given no authority to issue notes and make contracts in the continuation as distinguished from the liquidation of the firm's business. Estate of Davis and De Sanque, 5 Whart. (Pa.) 530, 34 Am. Dec. 574; Robinson v. Taylor & Co., 4 Pa. 242; McCowin v. Cubbison, 72 Pa. 358; Lloyd v. Thomas, 79 Pa. 68; Fulton v. Central Bank of Pittsburgh, 92 Pa. 112; Siegfried v. Ludwig, 102 Pa. 547; Meyran v. Abel, 189 Pa. 215, 42 Atl. 122, 69 Am. St. Rep. 806.

[6] To both the general rule and the Pennsylvania rule there is, of course, the well recognized exception that a surviving partner of a dissolved partnership in liquidating partnership assets has authority in some cases to continue the business for the purpose of completing existing contracts and in working up unused materials. Within this exception Walter Wood seeks to bring his conduct of the business after the death of Stuart. But this contention is inconsistent with his first position, that by the terms of the contract itself, the partnership was not dissolved until more than a year after Stuart's death, and it is inconsistent also with the manner in which he conducted the business, for, manifestly, he did not limit the business to the execution of existing contracts or to the manufacture of materials on hand, but continued as before in obtaining new contracts and in financing them to completion.

[7] Agreeing with the learned trial judge that the firm of R. D. Wood & Co. was dissolved by the death of Stuart, we hold with him that under the evidence the four notes in question were made without authority in the course of continuing the business, not in liquidation, and that, in consequence, Walter, and not the firm, is liable for their payment.

The third question is: Was the agreement between R. D. Wood & Co. and Florence Iron Works, by which the firm shared in the profits and losses of Florence, terminated by the death of Stuart Wood?

[8] This question like the others has arisen out of the informal way in which buisness between the firm and Florence was carried on. So far as the evidence discloses, there was never an express agreement as to the duration of the contract of agency between the firm and Florence. The only things the evidence shows about the contract are that Florence reimbursed the firm for expenditures in its behalf and the two shared its profits and losses; the former was done by direction of the firm according to its needs or to the ability of Florence to pay, the latter was done at the end of the calendar year. It is urged that the annual settlement is evidence that the contract ran for a year and was therefore not ended by the dissolution of the firm. We do not think that this business habit is evidence of the contract's terms, and, in default of any other evidence, we hold with the trial judge that the contract between the firm and Florence terminated with the firm's dissolution. Walter Wood conducted the business with Florence after the death of Stuart as though the partnership continued—with two results: First, money in substantial sums was loaned from time to time by Florence to the firm, and second, there was a settlement on August 31, 1914, of the amount due Florence by delivery of the firm's notes, which included not only the money balance due by the firm but one-half the losses incurred by Florence from March 2 to June 30, 1914. These results gave rise to the last question, which is: Is Walter Wood liable to the receiver of Florence Iron Works on the notes of R. D. Wood & Co. closing the open account between Florence and the firm for money loaned the firm and also for one-half the losses of Florence (under the contract of agency) between the date of

the firm's dissolution on Stuart's death and the date of settlement, amounting to $38,132.07 with interest?

This question relates to liability for the two notes of group 5.

[9-11] Money loaned the firm by Florence after Stuart's death was used for two purposes, a proper and an improper purpose in point of law. So much of it as was used in paying obligations of the firm incurred prior to its dissolution by Stuart's death constitutes a valid obligation of the firm, and the receiver must pay it. The portion of it that was not used in liquidation but was used in improperly conducting business after the firm's dissolution is not an obligation of the firm but is an obligation incurred by Walter, and he must pay it. To this extent, we agree with the learned trial judge in his decision on the last group of notes. But we do not find ourselves in accord with him in holding Walter liable also for one-half the losses incurred by Florence under the contract of agency. He held, and we think correctly, that the partnership was dissolved by the death of Stuart and that the firm's contract of agency ended with the dissolution of the partnership. No subsequent conduct of Walter as liquidating or continuing partner can make the firm liable for losses of Florence incurred after its contract with the firm had become extinct, just as no conduct of his would entitle the firm to one-half the profits that Florence might have made after the contract had ended. Between the firm and Florence there was no longer a contract. Therefore, it is very clear that the receiver of R. D. Wood & Co. is not liable to the receiver of Florence for one-half the losses of Florence incurred after the contract had expired. Why then should Walter be liable? Florence had no contract with him whereby he had agreed to share one-half its losses and one-half its profits. True, Walter went on after Stuart's death and operated Florence but without receiving advances for his expenses or payment for his disbursements as provided by the contract, if we read the record correctly. If Walter assumed the firm's contract with Florence after dissolution, he assumed the whole of it. This would entitle him to reimbursement for his expenses as well as it would hold him liable for one-half the losses.

For Walter's unauthorized acts of borrowing money from Florence for use in the prosecution of the business of the dissolved partnership, the law imposes liability upon him. In these transactions he got Florence's money. As the partnership is not liable for its return, he certainly must be liable. This is a very different liability from that of sharing losses with Florence imposed upon him by the decree of the court for continuing operations after the ending of the partnership contract, whereby nothing was taken from Florence and nothing enured to the firm or to Walter. What happened on the death of Stuart was a falling apart of the contractual relations of Florence with the firm. Clearly, Walter was not responsible for that. Florence was then (legally) free to make a new contract with anyone it chose. No new contract was made, but Walter went on doing business for Florence without a contract. Whether the law implies one, and whether, accordingly, Walter is entitled to compensation for his services, unprofitable as they were to Florence, are not matters of pres-

ent concern.   Similarly, the question whether in Walter's management of Florence, a clear distinction can be made between acts done in his capacity of surviving partner of the firm and acts done in his capacity as managing head of Florence, is not here for decision.

The old contract being extinct and no new contract containing a loss sharing provision having been made, Florence is without a contract containing such a provision that can be enforced against any one.   Therefore, Florence must bear the whole of its own losses. While this may be a hardship to Florence, it is one of the consequences of its manner of doing business, for which (legally) it alone is responsible.   Entertaining this view, we direct that the decree below be affirmed, except the part charging Walter Wood with one-half the losses of Florence incurred after the dissolution of the firm, and that the case be remanded with instructions that the decree be modified in this particular in accordance with this opinion.